# United States Court of Appeals
## For the First Circuit

Nos. 24-1474, 24-1867

UNITED STATES OF AMERICA,

Appellee,

v.

TEVIN ABERCROMBIE,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]
[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Rikelman and Aframe, Circuit Judges.

Stephen P. Super for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

December 16, 2025

**AFRAME, Circuit Judge.** A grand jury sitting in the District of Massachusetts indicted Tevin Abercrombie for unlawful possession of a firearm and ammunition by a felon after a Boston police officer found a loaded pistol under the front passenger seat of a car in which Abercrombie was sitting. See 18 U.S.C. § 922(g)(1). Abercrombie proceeded to trial, which ended in a guilty verdict. The district court denied Abercrombie's motions for a judgment of acquittal and new trial. See Fed. R. Crim. P. 29, 33. Abercrombie appeals the denial of these motions. We affirm.

## MOTION FOR A JUDGMENT OF ACQUITTAL

Abercrombie timely challenged the sufficiency of the evidence under Federal Rule of Criminal Procedure 29.[1] See United States v. Norris, 21 F.4th 188, 195 (1st Cir. 2021). In his motion, Abercrombie argued that the government's evidence of his firearm possession demonstrated only that he was present when the police discovered the firearm under his seat, which is insufficient to permit a conviction under § 922(g)(1). The district court

---

[1] Abercrombie also moved unsuccessfully to dismiss the indictment against him, arguing that § 922(g)(1) is facially invalid on Second Amendment grounds. On appeal, Abercrombie does not develop an argument for why § 922(g)(1) is facially invalid, noting only that the validity of § 922(g)(1) is subject to "ongoing legal discussion" and that United States v. Torres-Rosario, 658 F.3d 110 (1st Cir. 2011), appears inconsistent with his position. Therefore, Abercrombie has waived this claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 2 -

rejected Abercrombie's argument, concluding that the evidence was adequate for a reasonable juror to decide beyond a reasonable doubt that Abercrombie possessed the firearm.

We review de novo the denial of Abercrombie's motion for a judgment of acquittal. United States v. Mendoza-Maisonet, 962 F.3d 1, 11 (1st Cir. 2020). In evaluating the ruling, "we consider whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Ridolfi, 768 F.3d 57, 61 (1st Cir. 2014) (internal quotation marks omitted) (quoting United States v. Rodríguez, 735 F.3d 1, 7 (1st Cir. 2013)). "[O]ur focus when considering a sufficiency challenge always remains fixed on discerning whether the jury's guilty verdict finds support in a plausible rendition of the record, which properly includes reasonable, common sense inferences drawn from the evidence." Id.

Applying these standards, we describe the trial evidence in the light most favorable to the government. United States v. Santonastaso, 100 F.4th 62, 68 (1st Cir. 2024). At just after 6 p.m. on April 16, 2020, the Boston Police responded to a drive-by shooting in Roxbury on Station Street between Halleck and Mindoro Streets. A few minutes after the shooting, officers communicated via radio that a navy-blue Ford Fusion was the suspect car in the

shooting.[2]  At that time, two Boston Police officers, Thomas Driscoll and Matthew O'Loughlin, were canvassing the area near the shooting.  About two minutes after the radio notification, these officers saw a black Ford Fusion leave the parking lot of Fuentes Market on Gurney Street and turn onto Parker Street.  The officers, with back-up assistance, stopped the Fusion in the middle of Parker Street, believing it was the car involved in the shooting.

After initiating the traffic stop, Officer O'Loughlin approached the driver side of the Fusion and Officer Driscoll approached the passenger side.  Dominick Douglas was driving, and Abercrombie sat in the front passenger seat.  There were no backseat passengers.  Abercrombie wore dark clothing with a hood over his head, glasses, a medical mask, a blue surgical glove on his right hand, and no glove on his left hand.  The officers removed both Douglas and Abercrombie from the car.  Other officers pat-frisked them with negative results.  Douglas stated to Officer O'Loughlin that he was coming from the market and to go ahead and search the car because he had nothing in it.

Officer Driscoll searched the passenger area of the Fusion.  Within seconds, he observed a black pistol, which he did not touch.  The pistol, which held ammunition in the chamber and a magazine, had an obliterated serial number and was positioned a

---

[2]  That communication turned out to be erroneous.  Video evidence later showed that the shooter was inside a Honda CR-V.

few inches from the floor mat below the very front of Abercrombie's seat. The handle of the gun pointed toward the front of the car and the muzzle pointed toward the front passenger door. The gun was visible to Officer O'Loughlin when he stood at the frame of the front passenger door by leaning to the right. Officer Driscoll testified that the gun was positioned as he would expect if a right-handed person sitting in the front passenger seat had placed the gun under the seat.

After discovering the pistol, the police placed Douglas and Abercrombie under arrest. Shortly thereafter, Boston Police Detective Joe Medina began investigating the drive-by shooting and the pistol found in the car. Medina took photographs of the pistol, which was still positioned as Driscoll found it, and arranged for forensic and fingerprint testing of it, the magazine, and the ammunition. The testing determined that the pistol was operational and that there were no fingerprints on the firearm, magazine, or ammunition.

Detective Medina also collected surveillance videos from a variety of security cameras near the drive-by shooting. These videos showed a person inside a Honda CR-V discharge a firearm in the direction of three men; thereafter the three men scattered and disappeared. Less than a minute later, one of the men reappeared on video talking on a cell phone; a few seconds later, the Fusion entered the screen, traveled down Halleck Street, turned right on

- 5 -

Gurney Street, and parked in the Fuentes Market lot. The car arrived in the lot about two minutes after the shooting.

Once parked in the Fuentes Market lot, Douglas exited the driver's side of the Fusion, Abercrombie exited the right passenger side, and a third person exited the backseat. Douglas spoke with two of the men who had been shot at, and Abercrombie spoke on his cell phone. Abercrombie then reentered the front passenger seat. Detective Medina testified that, through a video displaying the Fusion's front windshield, he could see that Abercrombie was wearing a face mask and that his head "popp[ed] up" from the "floor mat area."

After looking toward the floor mat area, Abercrombie again left the car via the front passenger door of the Fusion and went inside Fuentes Market. Footage from inside the Market showed that Abercrombie kept his gloved right hand in his coat pocket while he touched various store items with his ungloved left hand. Other video from the Fuentes Market parking lot showed that no one entered the Fusion while Abercrombie was inside the store. Once Abercrombie left the store, he and Douglas engaged in additional conversation in the parking lot. At the end of the conversation, Douglas returned to the Fusion's driver seat, and Abercrombie returned to the front passenger seat. Detective Medina testified that, from the video, he observed the car back out of the parking

space while Abercrombie's blue mask again moved toward the floor mat area.

In addition to this evidence, the parties stipulated that: (1) the pistol found in the Fusion was operable and the associated ammunition was real; (2) the pistol and ammunition had traveled in interstate or foreign commerce; and (3) Abercrombie knew prior to the date of the charged offense that he had been convicted of a crime punishable by imprisonment for a term exceeding one year. Given these stipulations, the remaining contested issue for the jury was whether Abercrombie possessed the pistol found under his seat. The jury found Abercrombie guilty.

There are two kinds of knowing possession that may support a conviction under § 922(g)(1) -- actual and constructive. Ridolfi, 768 F.3d at 61. Actual possession would require proof that Abercrombie had "immediate, hands-on physical possession" of the pistol. United States v. Guzmán-Montañez, 756 F.3d 1, 8 (1st Cir. 2014). There is no evidence that Abercrombie held the firearm. We therefore focus on the adequacy of proof that Abercrombie constructively possessed the pistol.[3]

"Constructive possession is present 'when a person knowingly has the power at a particular time to exercise dominion

---

[3] Abercrombie was convicted of possessing both the pistol and the ammunition inside of it. We will confine our discussion to the evidence that Abercrombie possessed the pistol, which is also the evidence that Abercrombie possessed the ammunition.

- 7 -

and control over' an object." United States v. Sylvestre, 78 F.4th 28, 36 (1st Cir. 2023) (quoting United States v. Nuñez, 852 F.3d 141, 145 (1st Cir. 2017)).  Constructive possession does not require the defendant's actual ownership of the firearm, but it does require the defendant to have actual knowledge of the weapon. Ridolfi, 768 F.3d at 62.

"[C]onstructive possession may be proven 'by relying entirely upon circumstantial evidence,' . . . includ[ing] evidence of an individual's control over the area where the [firearm] is found."  United States v. Burgos, 133 F.4th 183, 190 (1st Cir. 2025) (quoting United States v. Fernández-Jorge, 894 F.3d 36, 43-44 (1st Cir. 2018)).  However, "mere proximity to a weapon is not sufficient to show . . . constructive possession." United States v. Weems, 322 F.3d 18, 24 (1st Cir. 2003).  Rather, "there must be some action, some word, or some conduct that links the individual to the contraband and indicates that he had some stake in it, some power over it."  United States v. Tanco-Baez, 942 F.3d 7, 26 (1st Cir. 2019) (internal quotation marks omitted) (quoting United States v. McLean, 409 F.3d 492, 501 (1st Cir. 2005)).

Our review of the record leads us to conclude that the government's proof satisfies the "prosecution-friendly" standard under Rule 29 such that the district court correctly denied Abercrombie's motion for a judgment of acquittal.  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999).  The evidence

- 8 -

demonstrated that Abercrombie exclusively controlled the front passenger seat where the pistol was located from the time that the Fusion appeared on the video driving toward Fuentes Market to when the police stopped the car and seized the pistol. No other person entered the front passenger seat during the operative time and the pistol could not easily have been placed toward the front of the passenger seat by someone occupying the backseat. Moreover, Officer O'Loughlin testified that the pistol was placed under the front seat in such a way that he could see it from the doorframe of the car by simply leaning to the right. The jury observed video of Abercrombie getting in and out of the Fusion multiple times. A reasonable juror could conclude that, just like Officer O'Loughlin, Abercrombie saw the pistol while standing at the doorframe. And, according to Officer Driscoll, the firearm was placed in a position consistent with how a right-handed occupant of the passenger seat, such as Abercrombie, would place a gun under that seat. See United States v. Maldonado-García, 446 F.3d 227, 231 (1st Cir. 2006) ("[C]onstructive possession of a firearm may be established by showing that the person knows (or has reason to know) that the firearm is within easy reach, so that he can take actual possession of it virtually at will.").

Significantly, there is also Abercrombie's wearing of a latex glove on his right hand. As we have noted in the probable cause context, wearing such a glove may indicate constructive

possession: "Latex gloves offer little if any protection against the weather. They most obviously would serve the function of preventing fingerprints from being left on items like [a] gun . . . . Wearing such gloves [is] thus a gesture suggesting an intention to exercise dominion and control over [a] gun . . . ." United States v. Jones, 432 F.3d 34, 42 (1st Cir. 2005). And Abercrombie's latex glove took on more significance here because neither the pistol, magazine, nor ammunition contained any fingerprints. The lack of fingerprints compounds the glove's significance insofar as it demonstrates that the person responsible for the pistol's presence knew to take precautions to keep it fingerprint-free. That Abercrombie took such precautions is incriminating.

Although Abercrombie argued he was wearing the latex glove as a prophylactic measure during the COVID-19 pandemic, the jury also saw video of Abercrombie inside Fuentes Market concealing his gloved hand while using his ungloved hand to touch store items. Abercrombie's placement of the gloved hand in his pocket suggests that he appreciated that wearing a single latex glove was unusual, and his touching of items with his ungloved hand suggests that he wore a single glove for a reason other than an aversion to skin contact with objects. A reasonable juror could conclude that Abercrombie's actual reason for wearing the single latex glove was

- 10 -

the desire to avoid leaving fingerprints on the contraband under his seat.

Finally, there was Detective Medina's testimony describing the video evidence from the Fuentes Market parking lot showing Abercrombie's head "popping up" from the "floor mat area" and Abercrombie "bending over . . . . [t]owards the floor mat." A rational juror could reason that Abercrombie showed repeated interest in the floor mat area while sitting in the front seat because he knew that a pistol was there. Taken together, these pieces of evidence -- Abercrombie's control over the front seat, the placement of the pistol, his wearing of one latex glove coupled with the lack of fingerprints on the contraband, and his repeated looking toward the floor mat area near the pistol -- support a verdict that Abercrombie was in constructive possession of the pistol under his seat.

We recognize that there is caselaw holding that the discovery of a gun under a seat coupled with an observation that the seat occupant leaned forward toward the gun's location is insufficient to sustain a conviction under § 922(g)(1), if only "barely" so. United States v. Blue, 957 F.2d 106, 108 (4th Cir. 1992); cf. United States v. Clark, 184 F.3d 858, 864-65 (D.C. Cir. 1999) (holding that reaching for a gun that was later found under the seat was sufficient to establish constructive possession). But that does not mean that a defendant leaning forward toward a

- 11 -

gun's location under the defendant's seat is irrelevant to the sufficiency analysis.

We made that point in United States v. Liranzo, 385 F.3d 66, 69-70 (1st Cir. 2004). There, we affirmed a jury's constructive-possession finding in circumstances where the police discovered a gun under the front passenger seat during a car stop. In affirming, we relied on testimony that (1) the defendant leaned forward toward the area where the gun was found and (2) the gun was propped up in a way suggesting that it could not have been in that location while the vehicle was moving. Id. Liranzo distinguished Blue on the ground that there was more evidence than just a gun under a seat and the seat occupant leaning forward. Id. at 70. Here, as in Liranzo, there is more than the discovery of a gun and Abercrombie leaning forward. As already discussed, the jury also heard that Abercrombie moved his head toward the area where the gun was located multiple times and wore a single latex glove on his right hand.

Abercrombie's arguments do not alter our conclusion that the evidence was sufficient to support his conviction. Abercrombie contends first that the government obtained his conviction by improperly creating the impression that he had a gang affiliation because he was speaking to the targets of the drive-by shooting shortly after it happened.

The difficulty with this argument is that it is not a sufficiency argument. Rather, it is a contention that the government offered prejudicial evidence or made a prejudicial argument. But Abercrombie did not object to the government's evidence or its argument and has not suggested in this Court that the district court committed plain error by failing sua sponte to limit the government's presentation in some respect.

In conducting a sufficiency analysis, we consider all the evidence admitted by the court, even if the court erroneously admitted some of that evidence. See United States v. O'Donovan, 126 F.4th 17, 37-38 (1st Cir. 2025). Even if the jury heard some prejudicial evidence or argument, which the government disputes, there is no way to know whether the jury was improperly influenced. See Fed. R. Evid. 606(b) (prohibiting testimony or evidence about statements made during jury deliberations). That is why a sufficiency challenge asks about the adequacy of the evidence to support a reasonable juror's verdict, not this jury's verdict. United States v. Ballinger, 155 F.4th 671, 674 (6th Cir. 2025). In evaluating whether a reasonable jury could convict on the evidence presented, we may reject only "those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative." United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995). As described above, the evidence was sufficient

for a reasonable juror to find Abercrombie guilty without any inferences related to the drive-by shooting.[4]

Abercrombie also contends that it is improper to rely on his bending toward the floor mat while sitting in the front passenger seat as evidence of guilt because, in addition to the pistol under the seat, there was a Gatorade bottle on the passenger-side floor. It was fair for Abercrombie to argue that the Gatorade bottle provided an alternate explanation for him bending towards the floor mat area. But it was also fair for Detective Medina to respond that he did not see the blue Gatorade bottle appear through the windshield during Abercrombie's multiple movements toward the floor, thereby suggesting that Abercrombie's real reason for bending toward the floor was to check the pistol, not the bottle. A trial's purpose is for jurors, based on the totality of evidence and their common sense, to resolve disputes like this. The government is not required to "disprove every

---

[4]    Abercrombie claims too that his calm demeanor during the traffic stop supported his argument that he did not know that the pistol was under his seat, and he was prejudiced by being unable to show supporting video evidence because Officer Driscoll failed to engage his body camera during the stop. Abercrombie discusses the district court's refusal to give an adverse instruction on this point. But the failure to give such an instruction does not bear on the sufficiency of the evidence, which is the only argument Abercrombie raises on appeal. See United States v. Baldyga, 233 F.3d 674, 679 n.3 (1st Cir. 2000) (noting that jury instruction error claims and sufficiency of the evidence claims "raise analytically distinct questions"). And in any event, Abercrombie was allowed to argue in his closing that Officer Driscoll's failure to engage the body camera weighed in his favor.

hypothesis consistent with the defendant's innocence." United States v. Apicelli, 839 F.3d 75, 80 (1st Cir. 2016) (internal quotation marks omitted) (quoting Spinney, 65 F.3d at 234). The jury was presented with differing theories about Abercombie's motivation for bending toward the floor, and it was entitled to rely on the motivation it believed was most reasonable. See United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006) ("The law is crystalline that, when the government has advanced several alternate theories of guilt . . . an ensuing conviction may stand as long as the evidence suffices to support any one of the submitted theories.").

The same rationale defeats Abercrombie's additional contention about the position of the pistol under his seat. Abercrombie emphasizes that his counsel challenged Officer Driscoll's testimony that the pistol was placed in a direction that is consistent with how a right-handed person sitting in the passenger seat would have placed it. His counsel suggested that such placement would require a right-handed person to engage in an awkward hand twist. But Officer Driscoll did not agree and provided a demonstration to support his view that the pistol placement suggested it was put there by a right-handed person. It was again the jury's role to decide which view to credit. See United States v. Cruz-Ramos, 987 F.3d 27, 38 (1st Cir. 2021) ("[S]ifting through conflicting testimony and determining where

- 15 -

the truth lies is . . . squarely within the jury's province, not ours." (internal quotation marks omitted) (quoting United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007))).

At bottom, Abercrombie contends that this case falls within the rule that a conviction should not stand where it requires the reviewing court to stack inference upon inference to sustain the verdict. See United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995). But that is not the situation we face. The government presented facts and argued why they supported Abercrombie's knowledge that the pistol was under his seat. Abercrombie provided alternate explanations for many of these facts. To affirm the conviction does not require that we stack inferences; it requires that we afford appropriate deference to the jury's "reasonable, common sense inferences drawn from the evidence." Ridolfi, 768 F.3d at 61.

## MOTION FOR A NEW TRIAL

In addition to seeking a judgment of acquittal, Abercrombie seeks a new trial under Federal Rule of Criminal Procedure 33. His argument is premised on assertions that (1) the evidence against him was thin and (2) the government filled evidentiary gaps by offering confusing arguments about the relevance of the drive-by shooting to his possession of the pistol.

Where a new trial motion is based on the weight of the evidence, a district court should not grant a new trial "unless it

- 16 -

is quite clear that the jury has reached a seriously erroneous result." United States v. Simon, 12 F.4th 1, 56 (1st Cir. 2021) (internal quotation marks omitted) (quoting United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)). Such a motion should be granted only "when the evidence preponderates heavily against the jury's verdict or a miscarriage of justice otherwise looms." Id. We review the denial of a mistrial motion for an abuse of discretion. Id.

As we have already explained, the case against Abercrombie was circumstantial. But that does not mean that he is entitled to a new trial. There was proof that gave rise to competing inferences and the jury's role was to choose between them. United States v. Ruiz, 105 F.3d 1492, 1502 (1st Cir. 1997). Here, the jury determined that the evidence, taken in its totality, sufficed to show beyond a reasonable doubt that Abercrombie constructively possessed the pistol. We acknowledge that reasonable people could have reached a different conclusion, but "a trial judge is not a thirteenth juror who may set aside a verdict merely because [the judge] would have reached a different result." Id. (internal quotation marks omitted) (quoting Rothrock, 806 F.2d at 322). Because we cannot conclude that the jury's verdict was seriously wrong, we cannot reverse the district court's denial of the new trial motion on strength-of-evidence grounds.

Abercrombie also suggests that we should order a new trial because the conviction, in his view, was infected by the government's presentation of confusing evidence. In this regard, Abercrombie says that the government presented conflicting theories that he retrieved the pistol after learning about the drive-by shooting through a phone call and also that he did not learn about the shooting until meeting the victims at Fuentes Market.

Based on our review of the record, we do not see substantial unfairness warranting a new trial based on the government's discussion of the drive-by shooting. No party disputes that, almost immediately after the shooting occurred, Abercrombie and Douglas arrived at the Fuentes Market parking lot, which was located near the site of the shooting, and once there conversed with targets of the shooting. The government provided videos of the drive-by shooting, the events immediately thereafter, and the meeting at Fuentes Market. Detective Medina testified to his observations from watching the videos. Based on that evidence, the government suggested that Abercrombie brought the pistol to Fuentes Market because his associates had just been targeted in a shooting. The jury had before it the videos from which the government offered this explanation, and it could evaluate the explanation for itself. We cannot say that it was a miscarriage of justice for the government to present a narrative

accounting for the presence of the pistol when the jury could evaluate that narrative based on its own review of the video evidence.  See United States v. Rodríguez-Vélez, 597 F.3d 32, 40 (1st Cir. 2010) ("[W]here, as here, the evidence can be viewed in different ways, we must honor the jury's evaluative choice among plausible, albeit competing, inferences.").

This was a close case that resulted in a conviction. Abercrombie offered almost no trial objections and has not raised any arguments on appeal challenging the district court's management of the trial.  The jury received evidence and arguments presenting competing narratives and then determined the version of events that it believed to be true.  In these circumstances, the jury's verdict was not a miscarriage of justice.  Thus, there is no reason to retry the case.[5]

## REVOCATION OF SUPERVISED RELEASE

There is one loose end.  Abercrombie also challenges the revocation of his supervised release imposed after a prior drug conviction.   The  revocation  was  based  on  his  constructive

---

[5]    Abercrombie suggests that, in ruling on the new-trial motion, the district court displayed confusion by stating that Abercrombie admitted that he was at Fuentes Market in response to the  shooting.    The  record  does  not  bear  out  any  confusion. Abercrombie's  counsel  suggested  that  there  was  likely communication about the shooting before Abercrombie and Douglas arrived at the Market.  The district court stated that inferences could be drawn from the video about the communications related to the shooting but that ultimately these inferences were not central to the case.

possession of the pistol. "[A] court may revoke a person's supervised release if it finds the government proved a release-condition violation by a preponderance of the evidence, which is a more-likely-than-not standard." United States v. Tanco-Pizarro, 892 F.3d 472, 475 (1st Cir. 2018) (citation omitted). As we have already explained, the evidence that Abercrombie constructively possessed the pistol was sufficient to support his conviction beyond a reasonable doubt. It was therefore also sufficient to warrant his revocation under a preponderance standard.

## CONCLUSION

We **affirm** Abercrombie's conviction and the revocation of his supervised release.